UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFREY P. SURFACE, *et al.*, | : | Case No. 1:15-cv-40 |
| Plaintiffs, | : | Judge Timothy S. Black |
| vs. | : | |
| OFFICER SCOTT CONKLIN, *et al.*, | : | |
| Defendants. | : | |

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 24)**

This civil action is before the Court on Defendant Officer Scott Conklin's motion for summary judgment (Doc. 24) and the parties' responsive memoranda (Docs. 28, 31).

**I.   BACKGROUND FACTS**

Plaintiffs Jeffrey Surface and Laura Pavlech filed this lawsuit on behalf of their twenty three year old son, Caleb Surface.  On January 18, 2014, Caleb was shot and killed by Fairfield Police Officer, Scott Conklin, after the Plaintiff-father, Jeffrey Surface, called 911, reporting that Caleb was out of control and that they needed to get him out of his house.  Caleb fled from the back door when Officer Todd Adamson arrived at the Surface residence.  Officer Conklin was dispatched to assist with setting up a perimeter. Officer Conklin spotted Caleb and followed him on foot.  The encounter culminated in Officer Conklin's discharge of his firearm two times, resulting in the death of Caleb Surface.

1

Plaintiffs are the parents of decedent Caleb Surface.  They now assert federal claims pursuant to 42 U.S.C. § 1983 for excessive force, and state law claims for wrongful death, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress.

Defendant Officer Conklin has moved for summary judgment on the basis that he is entitled to qualified immunity, and that there is no genuine issue of material fact that the force exercised by Conklin was reasonable.  For the reasons discussed more fully below, the Court denies Defendant's motion.

## II.   UNDISPUTED FACTS[1]

1. On the evening of January 18, 2014, Jeffrey Surface called 911 and informed the City of Fairfield Police Department dispatch that they needed to "get here quick" because he almost had to shoot his son.  (Doc. 24-1, Ex. 3).

2. Jeffrey Surface told dispatch that Caleb had ripped out his window screen and was "getting out of control and is nuts and I need to get him removed from my house." (Doc. 24-1, Ex. 3).

3. Jeffrey Surface provided the dispatcher with his son's name and his name, and reiterated that Caleb was inside the home, he had asked him to leave, and he refused to leave.  (Doc. 24-1, Ex. 3).

4. Dispatch asked Jeffrey Surface if he knew if Caleb was on alcohol or drugs, and he responded "yeah…yeah probably."  (Doc. 24-1, Ex. 3).

5. Jeffrey Surface stated to dispatch, "He's in his room, he's trying to open the door, grab a knife or something, I almost had to shoot him."  He further stated, "you need to send somebody over here now."   (Doc. 24-1, Ex. 3).

6. Jeffrey Surface told 911 dispatch that he (Jeffrey Surface) was in possession of a firearm.  (Doc. 24-1, Ex. 3).

---

[1] Docs. 25, 29, 30.

7. Dispatch requested officers to respond to the residence, stating that "23 year old son Caleb Surface is at the residence refusing to leave, believe he is on something either drugs or alcohol."  (Doc. 24-1, Ex. 1).

8. Officer Todd Adamson responded and indicated that he would pick it up.  (Doc. 24-1, Ex. 1).

9. Dispatch advised over radio to units en route to the residence that Caleb was in his room, tried to open a drawer to pull out a knife, that the caller had advised dispatch that he almost had to shoot him, that the caller had a firearm on him, and that the caller had walked away from the phone.  (Doc. 24-1, Ex. 1).

10. Dispatch advised over radio that Caleb had an active warrant for contempt of court with an original charge of theft.  (Doc. 24-1, Ex. 1).

11. Following dissemination of such information, dispatch received a call from Jeffrey Surface's girlfriend, Donna Riley, who was located in a Toyota Rav 4 that was running in the driveway of the residence.  (Doc. 24-1, Ex. 4).

12. Riley indicated that she went out to her Rav 4 because they were "going at it." (Doc. 24-1, Ex. 4).

13. Thereafter, dispatch stated on the radio that they no longer had contact with Jeffrey Surface inside the home, that Ms. Riley had called and indicated that she was seated in a Rav 4 in the driveway, and that in relation to Jeffrey Surface, it was "unknown if he has the firearm still on him."  (Doc. 24-1, Ex. 1).

14. Upon Adamson's arrival at the residence he advised over radio to Officer Conklin and others that Caleb ran out the back door.  (Doc. 24-1, Ex. 1).

15. Officer Adamson asked if a K-9 was available.  He was then asked if there were any additional charges, and he replied, domestic violence.  (Doc. 24-1, Ex. 1).

16. Radio traffic then indicates that Sergeant Don Garrett requested officers to set up a perimeter.  (Doc. 24-1, Ex. 1).

17. Upon learning that Caleb exited the back door, Office Conklin was dispatched to assist with setting up a perimeter for the fleeing suspect.  (Doc. 24-1, Ex. 1).

18. Officer Conklin was dispatched to park at the dead end of Polo Woods Court.  (Doc. 24-1, Ex. 1).

19. Jeffrey Surface showed Officer Adamson that he was in possession of his firearm upon Officer Adamson's entrance into the Spy Glass Hill Court residence, after Caleb Surface had exited through the back door of the residence. (Doc. 28-4).

20. Jeffrey Surface told Officer Adamson that Caleb might be suicidal. (Doc. 28-4).

21. In describing Caleb over dispatch, Officer Adamson stated that Caleb was "possibly suicidal", and further stated that Caleb asked to be shot and attempted to cut his wrists. (Doc. 24-1, Ex. 1).

22. After establishing a perimeter and parking his vehicle at Polo Woods Court, Conklin observed movement behind the homes located thereon. (Doc. 24-1, Ex. 2).

23. Officer Conklin was advised that Caleb approached the homes of at least two residences in the Polo Woods Court area and tried to enter the homes.[2] (Doc. 24-1, Ex. 2, Docs. 28-2, 28-3).

24. Officer Conklin stated to dispatch, "I believe I just saw him go behind a house. I'm going to see if I can catch up with him." (Doc. 24-1, Ex. 2).

25. Officer Conklin continued to follow Caleb through the back yards of Polo Woods Court. (Doc. 24-1).

26. Officer Conklin discharged his firearm two times, shooting and killing Caleb at approximately 8:25 p.m. on January 18, 2014. (Doc. 24-1, Ex. 2).

27. Upon Officer Adamson's arrival, Officers Conklin and Adamson searched Caleb's pockets. At that time, it was determined that Caleb had a cordless phone in his jacket pocket. (Doc. 24-1).

28. The events at issue occurred on a snowy evening, on January 18, 2014 from 7:57 p.m. until approximately 8:25 p.m. (Doc. 24-1, Ex. 1, 2; Doc. 28-1).

---

[2] The parties dispute whether Caleb attempted to and/or did enter any homes without consent or permission. Plaintiffs contend that Caleb only asked to use the telephone at each residence, and was denied by the owners. It is undisputed, however, that dispatch stated over the radio that a resident called police indicating that Caleb came to the door asking to come inside. (Doc. 24-1, Ex. 2).

4

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986). As the "requirement [of the Rule] is that there be no genuine issue of *material* fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis added); *see generally Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252; *see also Gregory v. Hunt*, 24 F.3d 781, 784 (6th Cir. 1994).

## III.    ANALYSIS

### A.    Qualified Immunity

Defendant Officer Conklin asserts that he is entitled to qualified immunity because he was engaged in a discretionary function and his conduct did not violate a clearly established statutory or constitutional right.

Qualified immunity protects officers from liability for mistakes of law and fact. *Chappell v. City of Cleveland*, 585 F.3d 901, 916 (6th Cir.2009).  The defense of qualified immunity completely protects government officials performing discretionary functions from Section 1983 actions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982).  A right is "clearly established if [a] reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Therefore, Officer Conklin is entitled to qualified immunity if a reasonable officer would have believed that the shooting was lawful, "in light of clearly established law and the information [Officer Conklin] possessed." *Bell v. City of East Cleveland*, 1997 WL 640116, at *2 (6th Cir. 1997), citing *Anderson*, 483 U.S. at 641.

Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful. *Bell*, 1997 WL 640116, at *3, citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002).  Qualified immunity "gives ample room for mistaken judgments by protecting 'all

6

but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), quoting *Malley v. Briggs*, 475 U.S. 335, 343(1986).

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526. As a result, the court must resolve qualified immunity questions as the earliest possible stage in litigation. *Hunter*, 502 U.S. at 227.

The plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir.2005). There is generally a two-step analysis to determine whether a police officer is entitled to qualified immunity. *Thacker v. Lawrence County*, 182 F. App'x 464, 468–69 (6th Cir. 2006) (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005). The first step asks whether the police officer violated a constitutional right. *Bell*, 1997 WL 640116, at *3. The second step determines whether the right was clearly established in a "particularized sense," such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right. *Id.* The court has discretion to decide which of the two elements to address first. *Id.*, citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Defendant Officer Conklin contends that he did not violate any constitutional right, citing the "objective reasonableness" standard set forth in *Graham v. Connor*, 490

7

U.S. 386 (1989). In analyzing claims of excessive force, three factors must be considered to determine the reasonableness of the force: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396.

Further, the "reasonableness" of a particular use of force is objective and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* It is not for the Court to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000). "The calculus of reasonableness must embody allowance for the fact police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. An officer may use deadly force where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others. *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 154 (6th Cir. 2013); *Tennessee v. Garner*, 471 U.S. 1, 11(1985).

In assessing Plaintiffs' excessive-force claim, this Court must construe all factual allegations in the record in the light most favorable to Plaintiff's claim. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir.2004). Once the Court has done so, "the question whether [Officer Conklin's] actions were objectively reasonable is 'a pure

question of law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) quoting *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007).

Defendant Officer Conklin asserts that prior to discharging his police firearm, Caleb twice stated that he had a gun. Specifically, according to Officer Conklin, Caleb stated, "I have a gun. Leave me alone." Officer Conklin further asserts that after he directed Caleb to keep his hands visible, Caleb responded by stating "Are you not listening to me? I have a gun. I will kill you." Plaintiffs argue that there are three witnesses who observed the interaction between Officer Conklin and Caleb, and that these witnesses did not hear Caleb ever make any statements to Officer Conklin. Thus, according to Plaintiffs, a genuine issue of material fact is presented regarding whether Caleb ever stated he had a gun, and, therefore, whether Officer Conklin had probable cause to believe that Caleb posed a threat of serious physical harm to himself or others.

The statements of two of the three witnesses cited by Plaintiff, Janna Craig and Katherine Kittrell, do not create a genuine issue of material fact. These witness affidavits merely fail to corroborate Officer Conklin's account of Caleb's statements regarding having a gun; they do not actually dispute Officer Conklin's account. Indeed, the affidavits of Ms. Craig and Ms. Kittrell do not actually dispute that Caleb said he had a gun; they simply indicate that they did not *hear* Caleb state anything to officer Conklin. There is a critical difference, as the Court of Appeals for the Sixth Circuit has established.

In *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009), the Sixth

9

Circuit addressed an alleged inconsistency in what the witnesses heard versus the officer's statements that they announced themselves. The court stated that, "the three witnesses' failure to hear the 'Cleveland Police' announcements does not refute the detectives' testimony that they in fact made several such announcements; it establishes only that the witnesses didn't hear the announcements. In other words, the discrepancy doesn't actually raise a *genuine* dispute of fact." *Id.* at 914 (emphasis in original). The court noted that even though the conditions were such that that the witnesses were in a position to hear the announcements, "it is likely they were paying attention to other matters." *Id.* Thus, the fact that all three witnesses in that case did not notice the detectives announcing themselves did not necessarily impugn the veracity of the detectives' account. *Id.*

    The witness affidavits of Janna Craig and Katherine Kittrell demonstrate that, as the events surrounding Caleb Surface's death unfolded, the two witnesses were at times "likely paying attention to other matters," as were the witnesses in *Chappell*. Janna Craig was outside shoveling her driveway when she first saw Caleb Surface jog past her. (Doc. 28-1). She thought nothing of it and went back to work, only for her attention to be redrawn to the event mere moments before the shooting took place. (*Id.*). Katherine Kittrell first encountered Caleb when he knocked at her door asking to use the telephone. (Doc. 28-3, at 1). Ms. Kittrell did not interact directly with Caleb; her father answered the door. (*Id.*). After Caleb left her house, Ms. Kittrell's affidavit describes her listening to a conversation between her father and a police officer outside of her house. (*Id.* at 2).

Katherine Kittrell did not see Caleb's shooting, as it occurred in a location she could not observe from her house. (*Id.*). Thus, neither of these affidavits demonstrate to the Court that the witnesses' attention was firmly fixed upon Caleb Surface or Officer Conklin during the events leading to Caleb's death; rather, the affidavits demonstrate the distracted attention the Sixth Circuit cautioned against lending too much credence to in *Chappell*.

However, Officer Conklin's account of the events surrounding Caleb Surface's death is more genuinely disputed by the February 18, 2016 affidavit of witness Melanie Freel, which was submitted as an exhibit to Plaintiffs' response to the current motion for summary judgment. Ms. Freel states in her affidavit that she witnessed the moment Caleb was killed from her back window, roughly 200 feet away from the cul-de-sac that served as the scene.³ (Doc. 28-2, at 2). According to the affidavit, Officer Conklin followed Caleb until the two were some distance greater than 50 yards apart. (*Id.*). At that time, Officer Conklin said, "Caleb, Stop." (*Id.*). Caleb then turned around, at which time Officer Conklin immediately fired his gun twice, killing Caleb. (*Id.*). Thus, under

---

3 The Court notes that Defendant's reply to his motion for summary judgment, in an attempt to discredit the reliability of the nonparty witness affidavits, greatly exaggerates the distance between the vantage point of the witnesses and the location of the incident. Defendant claims that the distance between Ms. Freel's vantage point in her house and the scene of the incident is "approximately 200 yards" and that the distance between Ms. Kittrell's vantage point in her house and the incident is "approximately 600 yards." (Doc. 31, at 5 n. 2). The map Defendant attached to that reply, however, tells a different story. Ms. Freel's vantage point is approximately 200 feet from the location of the incident, a much smaller distance than the 200 yards alleged. (Doc. 31-1). Defendant's measurement of Ms. Kittrell's distance from the incident is even further off. In that case, the error was not only in the unit of measurement used on the map but also in reading the map's distance markers; Ms. Kittrell was approximately 350 feet from the incident, not 600 yards as alleged. (*Id.*).

11

this witness's observations, Caleb did not speak, and there was no significant lapse of time between Officer Conklin's warning and the shooting that would have allowed Caleb to threaten Officer Conklin as Officer Conklin alleges.

The Court notes that the exact statement from Melanie Freel's February 18, 2016 affidavit was that she "never heard Caleb Surface speak a word" from the moment he left her home. (Doc. 28-2, at 2). This statement, on the surface, seems to implicate the same issue highlighted by the Sixth Circuit in *Chappell* as the statements of the other two witnesses—the critical difference between saying "I did not hear the decedent say anything" and "the decedent did not say anything." However, unlike the other nonparty witnesses in this case, and unlike the witnesses in *Chappell*, Ms. Freel's testimony clearly indicates that her continuous, undivided attention was focused on Caleb Surface from the moment he left her house until his death. There were no indications that Ms. Freel was "likely . . . paying attention to other matters" as was found in *Chappell*. *Chappell*, 585 F.3d at 914. The Court therefore attributes a distinct credibility to Ms. Freel's testimony regarding Caleb's lack of response that cannot be found for the other nonparty witnesses.

The February 18, 2016 affidavit of Melanie Freel raises a genuine issue of material fact that prevents this Court from declaring that Officer Conklin's actions were objectively reasonable. This affidavit directly contradicts Officer Conklin's version of events, in which Officer Conklin allowed Caleb time to respond to his order to stop moving before firing and Caleb directly threatened to shoot Officer Conklin with a gun. If the Court takes Melanie Freel's February 18 affidavit as the true version of events,

which it must in evaluating Defendant's motion for summary judgment, it was not objectively reasonable for Officer Conklin to fire his weapon at a fleeing suspect immediately after telling him to stop moving, without giving a proper chance to respond in any way. This is true even given the information Officer Conklin had been given about Caleb by the police dispatch before arriving at the scene; at the moment of the shooting, the events as described in Melanie Freel's February 18 affidavit do not demonstrate probable cause for Officer Conklin to believe that there was a genuine threat to his life or the lives of others.

Melanie Freel's February 18, 2016 affidavit is incongruous with much of the other evidence available for the Court's review. Officer Conklin's version of events is directly contradictory to Ms. Freel's statements. The testimony of other witnesses to the shooting also differs from the Freel affidavit in key respects—witness Janna Craig stated in an affidavit that Caleb put his right hand in his jacket pocket and was "fishing around" after Officer Conklin told him to put his hands up in the air. (Doc. 28-1). Finally, Ms. Freel's February 18, 2016 affidavit contains discrepancies with an earlier affidavit given by Ms. Freel on January 18, 2014, the day of the shooting. In the earlier affidavit, Ms. Freel states that Caleb, who came to her house looking to use the telephone, was "reaching into his pockets in his coat," a suspicious behavior that was excluded from her later affidavit. (Doc. 31-2).

These discrepancies in the evidence are evident. A genuine dispute of fact remains, the disputed facts are material, and the evidence taken in the light most

13

favorable to Plaintiffs would not exonerate Defendant's actions as a matter of law. Accordingly, entry of summary judgment by the Court is not appropriate.

**State Law Claims**

In addition to Officer Conklin's request for qualified immunity from Plaintiffs' claim under 42 U.S.C. § 1983, his motion for summary judgment further argues that he is entitled to state tort immunity under Ohio Revised Code § 2744.03(A)(6)(b) for each of the state claims asserted by Plaintiffs. An officer who uses deadly force in appropriate circumstances is entitled to statutory immunity, unless the officer's actions are done with malicious purpose, in bad faith, or in a wanton or reckless manner. *Kendzierski v. Carney,* C.A. No. 22739, 2005 WL 3482397 (Ohio Ct. App. Dec. 21, 2005).

Here, the Court has already found that it cannot declare as a matter of law that Officer Conklin's use of force was objectively reasonable. It follows that at this time the Court cannot conclude as a matter of law whether Officer Conklin's conduct was malicious, in bad faith, or in a wanton or reckless manner. *See Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 404 (6th Cir. 2015). As a result, Officer Conklin is not entitled to state tort immunity through summary judgment.

### IV. CONCLUSION

The Court concludes that there remains a genuine dispute of material fact as to whether Defendant Officer Scott Conklin acted reasonably such that there are no viable state or federal claims against him. Accordingly, the Court **DENIES** Defendant's motion for summary judgment (Doc. 24).

**IT IS SO ORDERED**.

Date:  3/20/17

*Timothy S. Black*
Timothy S. Black
United States District Judge